**Nikoo v. Hunt**

C.P. of Montgomery County, no. 96-07680.

*Thomas F. Reilly,* for plaintiffs.
*Victor M. Verbeke,* for defendant.

SALUS, *J.,* September 21, 2000—Plaintiffs appeal a July 20, 2000 order of this court denying their motion for removal of nonsuit. In their concise statement of matters complained of on appeal, plaintiffs frame the issue on appeal as follows: "whether the trial court erred

in granting defendant, Michael Hunt's oral motion for nonsuit, finding that reasonable minds could not disagree that plaintiffs failed to establish that plaintiff, Nancy Nikoo suffered serious injury and/or serious impairment of a bodily function in accordance with the applicable statutes pertaining to limited tort liability." For the reasons contained herein, this court did not commit error and the July 20, 2000 order should be affirmed.

## FACTUAL AND PROCEDURAL HISTORY

Plaintiff Nancy Nikoo was involved in an automobile accident on September 19, 1995.[1] As the accident occurred, Nancy felt an electrical type of shock going through her neck and into her back and shoulders.[2] She then drove to the Chelthenham police station to fill out a report and then drove herself to Abington Hospital, where she was given medication for muscle spasms.[3] Three days after her accident, Nancy sought treatment from Dr. Richard Cautilli for pain in her neck.[4] In her first month of treatment, Nancy received four epidural injections and received physical therapy at Holy Redeemer Sports Medicine.[5] Dr. Cautilli never restricted Nancy from any activity.[6]

In June 1997, Nancy began treatment with Dr. Michael Rubenstein (a neurologist).[7] Dr. Rubenstein treated Nancy four times, the last being December 1997.[8] At the

1. N.T. 5/4/00 at 188.
2. N.T. 5/4/00 at 188.
3. N.T. 5/4/00 at 191-192.
4. N.T. 5/4/00 at 227.
5. N.T. 5/4/00 at 194-95.
6. N.T. 5/4/00 at 239.
7. N.T. 5/4/00 at 244.
8. N.T. 5/3/00 at 98, 115, 124, 125.

first visit, Dr. Rubenstein made no objective findings of any functional limitation in the neck nor did he notice any limitation of motion of the neck.[9] The only finding was of tenderness in Nancy's neck.[10] The remainder of the examinations this day was normal, outside of the soft tissue injury.[11] Dr. Rubenstein ordered a battery of tests on Nancy, all of which came back negative.[12]

At each of Nancy's next three visits, Dr. Rubenstein's physical examinations were normal or unchanged.[13] His records contain no references to pain or tenderness in the neck, and are without clear evidence of radiculopathy.[14] At Nancy's final visit in December, she indicated that she was doing reasonably well with some improvement in overall activity.[15] Dr. Rubenstein never restricted Nancy from any activities.[16] Dr. Rubenstein never determined a level of disability and never made a statement that Nancy's neck function was impaired.[17] Also, during the course of Nancy's physical therapy, she was able to begin cooking, cleaning and playing tennis.[18] At trial, Dr. Rubenstein opined that Nancy had suffered a chronic soft tissue injury and that she may intermittently feel better for periods of time but that Nancy's

---

9. N.T. 5/3/00 at 141.

10. N.T. 5/3/00 at 109.

11. N.T. 5/3/00 at 109-11 (motor strength intact, deep tendon reflexes in the upper extremities symmetric and intact, no compression of the nerve root or major nerve injury, no muscle spasm).

12. N.T. 5/3/00 at 112.

13. N.T. 5/3/00 at 150-52.

14. N.T. 5/3/00 at 151-53.

15. N.T. 5/3/00 at 126.

16. N.T. 5/3/00 at 142.

17. N.T. 5/3/00 at 141, 155.

18. N.T. 5/3/00 at 157-58.

condition was permanent.[19] Dr. Rubenstein never testified that the soft tissue injury, to a reasonable degree of medical certainty, was caused by the motor vehicle accident in September 1995.

MRIs taken on October 9, 1995 and April 22, 1997 revealed mild degenerative disc disease at C5-6.[20] This condition was the product of wear and tear and was not due to the accident.[21] An EMG taken on May 14, 1997 showed increasing irritability but was not tied to any cervical radiculopathy from the accident.[22] Dr. Rubenstein reviewed the cervical spine MRIs and opined that they revealed essentially arthritic changes or spurring of bone.[23] He also reviewed the EMG testing and opined that he could not demonstrate any clear evidence of radiculopathy based on his gross examination.[24]

## ANALYSIS

"A motion for . . . nonsuit allows a defendant to test the sufficiency of a plaintiff's evidence and may be entered only in cases where it is clear that the plaintiff has not established a cause of action." *Burke v. Buck Hotel Inc.,* 742 A.2d 239, 246 (Pa. Commw. 1999). In making this determination, the plaintiff must be given the benefit of all evidence favorable to him, together with all reasonable inferences of fact arising therefrom, and any conflict in the evidence must be resolved in his favor. *Id.* A judgment of nonsuit is properly entered if a plaintiff

---

19. N.T. 5/3/00 at 110, 127-28.
20. N.T. 5/3/00 at 142-43.
21. N.T. 5/3/00 at 143.
22. N.T. 5/3/00 at 143-44.
23. N.T. 5/3/00 at 108.
24. N.T. 5/3/00 at 15-16.

has not introduced sufficient evidence to establish the elements necessary to maintain an action. *Id.* It is the duty of the trial judge to determine, prior to sending the case to the jury, whether or not this burden has been met. *Id.*

Turning to the case at hand, under the Pennsylvania Motor Vehicle Financial Responsibility Law, 75 Pa.C.S. §1705(d), a plaintiff cannot recover for pain and suffering or other noneconomic damages unless she sustained a "serious injury." 75 Pa.C.S. §1702 defines "serious injury" as "a personal injury resulting in death, serious impairment of body function or permanent disfigurement." As death and disfigurement are not at issue, the inquiry turns on whether Nancy suffered "serious impairment of body function." As set forth in *Washington v. Baxter,* 553 Pa. 434, 719 A.2d 733 (1998):

"The 'serious impairment of a body function' threshold contains two inquiries:

"(a) What body function, if any, was impaired because of injuries sustained in a motor vehicle accident?

"(b) Was the impairment of the body function serious? The focus of these inquiries is not on the injuries themselves, but on how the injuries affected a particular body function. Generally, medical testimony will be needed to establish the existence, extent, and permanency of the impairment. . . . In determining whether the impairment was serious, several factors should be considered: the extent of the impairment, the length of time the impairment lasted, the treatment required to correct the impairment, and any other relevant factors. An impairment need not be permanent to be serious." *Id.,* 553 Pa. at 447-48, 719 A.2d at 740. (citations omitted)

Two cases decided after *Washington v. Baxter* help provide further insight into what constitutes "serious impairment of bodily function." *McGee v. Muldowney,* 750 A.2d 912 (Pa. Super. 2000) and *Robinson v. Upole,* 750 A.2d 339 (Pa. Super. 2000). In *McGee,* appellant failed to present objective medical evidence as to the degree of any impairment and extent of any pain suffered during the years preceding disposition of the case. *Id.* at 915. Appellant's mere subjective allegations, in the absence of medical testimony, did not permit a finding that appellant suffered the requisite "serious injury." *Id.* This case can be analogized to *McGee,* in that there is no objective medical evidence as to the degree of any impairment and extent of any pain suffered. Dr. Rubenstein never testified, to a reasonable degree of medical certainty, that the soft tissue injury constituted an "impairment of body function" or was a "serious impairment" in that it would prevent Nancy from engaging in her daily activities. Summarily, Dr. Rubenstein merely testified that Nancy suffered a soft tissue injury that would continue to intermittently bother her. The injury, however, was never medically qualified in terms of impairment or seriousness of impairment, as required by *McGee* and *Washington.*

This case differs from *Upole* in that, in *Upole,* medical testimony demonstrated that the plaintiff suffered from chronic pain syndrome, fibromyalgia, and a sleep impairment, all resulting from the accident. *Id.* at 341. Plaintiff's doctors in *Upole* placed affirmative restrictions on the plaintiff's activities. *Id.* Here, as relates to the accident, Nancy only suffered a soft tissue injury. Also, no restrictions were placed on Nancy. *Upole* involves well-documented medical testimony regarding the

extent of appellant's injuries, followed by restrictions from the treating physicians on appellant's activities. Conversely, the medical testimony here only identifies a vague soft tissue injury, followed by no medical restrictions. Thus, plaintiffs have failed to show that the impairment of the bodily function was serious.

Furthermore, plaintiffs failed to demonstrate what bodily function was impaired because of injuries sustained in *this* motor vehicle accident. Dr. Rubenstein never testified that the soft tissue injury, to a reasonable degree of medical certainty, was caused by the motor vehicle accident in September 1995. Nancy had injuries to her neck before the accident.[25] She was injured in an automobile accident in 1988.[26] She was in an automobile accident in 1990 where she complained of neck pain.[27] Neither of these accidents was explained in any detail to Dr. Rubenstein.[28] Nancy also experienced injuries to her right shoulder and neck while playing tennis before the accident.[29] Nancy slipped and fell at a meat market on December 22, 1997, causing her an increase in pain.[30] Nancy's treatment with Dr. Rubenstein was for the soft tissue injury in toto. His testimony does not identify how the different accidents related to the injury. Instead it merely shows that the injury is present.

25. N.T. 5/3/00 at 129.
26. N.T. 5/3/00 at 130.
27. N.T. 5/3/00 at 131.
28. N.T. 5/3/00 at 130-31.
29. N.T. 5/3/00 at 148-49.
30. N.T. 5/3/00 at 152.

## CONCLUSION

In light of *Washington* and the cases that follow it, nonsuit was properly granted. First, plaintiffs did not demonstrate that there was serious impairment of a bodily function. Second, plaintiffs failed to demonstrate what bodily function was impaired because of injuries sustained in the accident. For this reason, the court's order of July 20, 2000 should be affirmed.